IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARK JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No 4:11-CV-1599-AGF-SPM |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of

Plaintiff Mark Johnson for disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.* (the "Act"). This matter was referred to the undersigned United States

Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b).

The undersigned recommends that the decision of the Commissioner be reversed and the case be

remanded to the ALJ for further consideration.

## I.     PROCEDURAL HISTORY

Plaintiff filed his application for benefits under Title II of the Act on October 9, 2007,

claiming disability because of "paranoia; suicidal; hearing loss in both ears; anxiety attacks."

(Tr. 107; 120). Plaintiff met the earnings requirement for disability purposes until December 31,

1987 (the "date last insured"). (Tr. 42). Plaintiff's alleged disability onset date was June 1,

1985. (Tr. 107). Plaintiff's applications were denied initially. (Tr. 42-46). A hearing was held before James E. Seiler, an Administrative Law Judge ("ALJ") on September 2, 2009. (Tr. 27-40). Following the hearing, on December 22, 2009, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 11-21). On July 15, 2011, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues (1) that the ALJ's finding that Plaintiff could return to his past work as a post office worker is not supported by substantial evidence; (2) that the ALJ's alternative finding that Plaintiff could perform other jobs existing in significant numbers in the national economy was not supported by substantial evidence; and (3) that the ALJ erred in not considering medical evidence from before the onset date alleged by Plaintiff.

## II.    FACTUAL BACKGROUND

### A. MEDICAL TREATMENT[1]

#### 1. MEDICAL RECORDS BEFORE JUNE 1, 1985 (ALLEGED DISABILITY ONSET DATE)

Plaintiff was seen at the St. Louis VA hospital (the "VA") on several occasions between June 1982 and May 1985 for mental and physical problems.

On June 10, Plaintiff went to the VA hospital complaining of trembling arms and hands and anxiety. Plaintiff claimed that he had suffered a "nervous breakdown" following a May 1981 explosion that occurred on the deck of an aircraft carrier. In the explosion, Plaintiff was thrown into the air and injured, and several of his close friends were killed and dismembered. It

---

[1] The below discussion is not intended to be an exhaustive summary of all of Plaintiff's medical records. Rather, this summary is focused on the most relevant records from the period of Plaintiff's alleged disability, as well as the most relevant records from the years shortly before and after Plaintiff's alleged period of disability.

was noted that Plaintiff "vividly recalls the gore." He stated that shortly after the accident, he was placed in a Navy hospital and placed on undetermined medications that caused him to "drool and stare into the corner." He stated that shortly thereafter, he was given an honorable discharge-unfit for duty. He reported that since his discharge, he had been unable to gain employment. He also reported that he had trouble falling asleep, that he had gruesome nightmares, and that he had been rejected by his friends. He felt the CIA might be trying to prevent him from telling the truth about military life. The impression was severe anxiety secondary to a traumatic episode, with some element of mild depression and paranoia, rule out organic brain dysfunction secondary to accident. The recommendations were diazepam, psychotherapy, and referrals for neurological and audiometric consults. Medication and therapy were recommended. Plaintiff refused hospitalization. (Tr. 257-58).

On June 14, 1982, Plaintiff returned to the VA hospital and was noted to be tense, irritable, and withdrawn. (Tr. 260).

On June 21, 1982, Plaintiff returned to the VA hospital and was diagnosed with "post-traumatic neurosis," and hospitalization was advised. (Tr. 260). Plaintiff was hospitalized from June 21 through June 28. (Tr. 265, 288). It was noted that he had extreme tremors of his limbs and that he was stuttering remarkably, that he had nightmares about the accident, that he had extreme anxiety, and that he showed signs of depression. (Tr. 344). On June 22, a comprehensive treatment plan was developed to treat Plaintiff's post-traumatic stress disorder, organic affective disorder, and speech and hearing difficulty. It included graded doses of medication, individual therapy, relaxation class, consultations with audiology and neurology, and exploration of employment possibilities. (Tr. 271). During his hospital stay, Plaintiff was started on Elavil and Vistaril, and he also received individual therapy. (Tr. 344-45). At the time

of discharge, it was noted that Plaintiff had "shown markable improvement."  His stuttering had stopped completely, and his hand tremors were very minimal.  At discharge, he was "considered competent in VA terms," was "not suicidal," had "no signs of any apparent thought disorder," had "no hallucinations," had "no delusions," and "could resume normal activities."  (Tr. 345).

During Plaintiff's hospital stay, the nursing staff noted that he had "anger, resentment, and hostility at the VA system and the nursing staff."  (Tr. 281).  On June 26, he became verbally hostile and threatening toward hospital staff during an argument about whether he could keep a tape recorder in his room.  (Tr. 282-83).  He also became angry in a discussion about clothing his wife had brought for him, and he threw the clothing into the nurse's station.  A nurse reported that he was "insulting, threatening, and bigoted in his remarks" to the nurse and that he said, ""I don't have to deal with you—you're so thin, I could just break your neck."  (Tr. 283).  However, Plaintiff later took his anxiety medication and was reported to be very polite.  (Tr. 283-84).  On June 27, Plaintiff refused his medication several times.  (Tr. 284-87).  He later stated, "Those white people made me beg for my medicine, and I don't trust them messing in my medication."  (Tr. 284).  He also discussed his intention to have Channel 2 investigate the hospital and talked about an investigation by Congressman Clay.  (Tr. 285-86).  The nursing staff wrote that he felt that whites had wrongfully accused him of stealing from the government and had humiliated him.  (Tr. 286).  On June 28, he again refused medication.  (Tr. 287).

On July 14, 1982, Plaintiff returned to the VA, stating that he found himself getting very angry at "whites."  He was stuttering slightly.  (Tr. 292).  He appeared very angry but did not appear suicidal.  (Tr. 291).  There was slight stuttering, but otherwise his speech was coherent. (Tr. 292).

On July 15, Plaintiff returned to the VA, but he wanted to be treated as an outpatient. (Tr. 292). He was discharged with diagnoses of post-traumatic stress disorder and major depression, and his medications were Elavil, Restoril, and Vistaril. (Tr. 292-93).

On July 29, 1982, Plaintiff was seen by an audiologist who found significant high frequency hearing loss in both ears and stated that there was a "definite psychogenic/functional component." (Tr. 265).

On August 23, 1983, Plaintiff returned to the VA, reporting flashbacks, nightmares, and depression. He had a severe stutter and "almost explosive speech," as well as tremors in his upper extremities. (Tr. 301). It was noted that "some paranoid ideas exist toward his past treatment by government officials in losing his records, saying he never existed." (Tr. 301-02). The impressions were post-traumatic stress disorder, chronic; major depression vs. dysthymic; and rule out personality disorder, histrionic. (Tr. 302). A week later, on August 30, a VA psychologist found him to be depressed, anxious, and suspicious, with low self-esteem, and diagnosed post-traumatic stress disorder. (Tr. 308-09).

On December 31, 1983, Plaintiff returned, stating that he had felt dizzy and passed out "on the job" the previous night. The doctor found no obvious etiology for his symptoms and suggested they were possibly related to his psychiatric history. He also noted a history of schizophrenia and questionable vasovagal syncope. Plaintiff chose to leave the hospital before evaluation was completed. (Tr. 310).

On November 24, 1984, Plaintiff returned to the VA hospital. Plaintiff reported that he ran a construction business, that he felt a responsibility for "keeping the people alive," and that he had suicidal thoughts. The treatment notes mention possible psychosis or schizophrenia.

Plaintiff decided against being admitted to the hospital, preferring individual counseling. (Tr. 312).

From February 4, 1985 to February 5, 1985, Plaintiff was hospitalized at the VA hospital. (Tr. 315-334). At admission, he presented with depression and was withdrawn with a depressed affect, unable to provide information. There was some suggestion of PCP intoxication, and he thought someone might have put some in his coffee. His ex-mother-in-law, who brought him in, reported three months of "bizarre" behavior and said that his wife had divorced him in November 1984 because of physical abuse. Plaintiff was given Haldol, and he improved. (Tr. 315). At discharge, he was noted to be "improved" and was given provisional diagnoses of drug psychosis and adjustment disorder. He was discharged against medical advice. (Tr. 332).

On February 18, 1985, Plaintiff returned to the VA hospital for re-evaluation. He stated that he had insomnia and was feeling nervous. He noted that he was working at the post office. (Tr. 307). It was noted that he was cooperative and had no delusions or hallucinations and an "ok" memory. The provisional diagnosis was obsessive-compulsive personality. The doctor offered admission to the hospital for evaluation, but Plaintiff declined, stating that he would lose his job. (Tr. 306).

On May 31, 1985, Plaintiff was referred to the VA hospital by a post office doctor because of a flash back syndrome related to the accident on the aircraft carrier. He stated that he had trouble with the side effects of Haldol. (Tr. 336). On examination, he was alert, oriented, fairly calm, articulate, and cooperative, with an appropriate affect. The diagnosis was borderline personality disorder, rule out PTSD. Lithium was prescribed. (Tr. 337).

### 2. MEDICAL RECORDS BETWEEN JUNE 1, 1985 (ALLEGED ONSET DATE) AND DECEMBER 31, 1987 (DATE LAST INSURED)

On June 6, 1985, Plaintiff returned to the VA and reported that the Lithium he was taking was too strong as a sedative, described continuous anxiety and dissociative experiences (mind blank). Some crying and histrionic behavior was observed. There was no evidence of suicidal or homicidal intent. He felt he was ready to return to work. (Tr. 342). Hydroxizine was prescribed.

On June 13, 1985, Plaintiff reported that the medication helped some with his anxiety, and it was continued. He had returned to work but had been reassigned to a different job. (Tr. 342). The next day, he reported being sent to a psychiatrist for evaluation by his job and being laid off with pay. (Tr. 343).

On October 21, 1986, Plaintiff went to the VA Mental Health Clinic complaining of depression and thoughts of killing himself. (Tr. 352-54). However, he later denied suicidal ideations. (Tr. 352). He reported that he was "handling situations ok" and was doing some odd jobs. He did not want to be admitted because he wanted to finish his odd jobs; however, he did want to be followed. He described an argument and stated that he was afraid he might lose his temper or get violent, so he sought help. His mood was mildly depressed, his affect blunted, and he denied suicidal or homicidal thoughts or hallucinations. He was described as "grandiose." The doctor did not feel that he presented a danger to himself or others. He was diagnosed with borderline personality disorder and PTSD by history. Mellaril was prescribed. (Tr. 353). He was diagnosed with depression. (Tr. 354).

### 3. MEDICAL RECORDS AFTER DECEMBER 31, 1987 (DATE LAST INSURED)

On February 5, 1988, Plaintiff was seen at the VA Mental Health Clinic. (Tr. 359-60). He reported that he was out of medication, that he was under a lot of stress, and that he felt

somewhat depressed. (Tr. 359). He stated that he was self-employed, doing freelance drafting. It was noted that he was friendly, cooperative, very histrionic, closed his eyes while conversing, gave very vague answers, and was difficult to pin down to facts. He had no evident delusions, hallucinations, or thought disorder and did not appear to be a suicide risk at the time. He was diagnosed with major depression, recurrent – provisional. (Tr. 360).

## B. OPINION AND OTHER EVIDENCE

### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM OF JUDITH MCGEE, PH.D. (NOVEMBER 15, 2007)

On November 15, 2007, Judith McGee, Ph.D., completed a Psychiatric Review Technique form in which she gave her opinion that as of Plaintiff's date last insured of December 31, 1987, there was insufficient evidence to establish that he was disabled. (Tr. 214-224).

### 2. VA DISABILITY DETERMINATIONS

On October 18, 1982, the VA determined that Plaintiff was entitled to 30% compensation benefits effective August 4, 1981, for his service-connected nervous condition. (Tr. 153). Later, the VA determined that Plaintiff was 100% disabled as of November 1, 1991. (Tr. 157).

## C. PLAINTIFF'S TESTIMONY AND STATEMENTS

At the hearing before the ALJ, Plaintiff testified as follows. He was born September 26, 1957. He lives in a house with his wife, daughter, and grandchild. (Tr. 28). He was, at the time of the hearing, receiving disability income from the United States Navy after an honorable medical discharge, and had been doing so since approximately 1982. (Tr. 29, 31). He graduated from high school and attended some college classes, and he has had some vocational training in drafting that he did not finish. (Tr. 30). In the Navy, Plaintiff worked on the flight deck, in

aviation supply, as an avian fireman, and as a marksman.  (Tr. 39).  Plaintiff worked for the United States Postal Service sometime in the 1980s.  (Tr. 31).

When Plaintiff was in the Navy, he was on the flight deck of an aircraft carrier when an F14 crashed on the flight deck, causing multiple explosions.  Plaintiff was thrown in the second explosion and injured.  Plaintiff believes he is disabled because he has flashbacks to the accident; his mind has him do things he should not do; his behavior is unacceptable in public and in a work environment; he has thoughts of killing people; he angers easily; and he cannot accept the behavior of others towards him.  He thinks this stems back to his "training of killing" in the United States military.  (Tr. 32).  Plaintiff sees a psychiatrist, Dr. Montgomery, and has seen another in the past.  (Tr. 38-39).

Plaintiff also has shaking, constant bad knees, constant headaches, and stiffness.  He takes about twelve aspirins a day.  (Tr. 33).  His headaches worsened after he got hit by a bus in the 1980s or 1990s (he is not sure when that occurred), and he has had the knee problems since he got out of the military.  (Tr. 33-34).  He can only be on his feet for an hour or two before he aches and has to sit down.  He can walk about a block without dizziness and knee and head pain.  (Tr. 34).  Going up and down steps bothers his knees, and he has fallen down steps this year, last year, and the year before.  He can carry up to 30 pounds.  He has trouble sitting for long periods of time because he is agitated due to his "nerves from the explosion."  (Tr. 35).  His medications cause him dry mouth and sleepiness; he finds himself falling asleep during the day.  (Tr. 35-36).  His medications do not allow him to drive.  (Tr. 31).  He can take care of his personal needs as long as he can use a pull bar in the shower.  He spends most of his time during the day asleep.  He has no friends.  (Tr. 37).  He has some problems with reading and writing.  (Tr. 31).  He does

no cooking because his wife says he will "forget" and burn up the kitchen; he does no grocery shopping, dishes, housework, laundry, or yard work. (Tr. 36).

Asked if he talks to his neighbors, he responded that one of his neighbors was a child molester and Plaintiff "had to shoot up his house"; that another one was lying in a bush pointing a rifle at Plaintiff's daughter's head; that "they jumped [Plaintiff's] wife in the middle of the street" and he "had to shoot at him"; that "[w]hen [Plaintiff] woke up and found out what was going on, [he] went out and shot up the street because they were trying to kill my family." (Tr. 37). He tries to stay away from people because they are corrupt. Plaintiff does not see family members on a regular basis other than those he lives with, does not go to church, and has no hobbies except for painting. However, he states that he can no longer paint because he shakes too much. (Tr. 38).

In a Disability Report – Field Office – Form SSA-3367 dated October 9, 2007, it was noted that Plaintiff had started "screaming at" the interviewer for lying about having tried to call him, that he gave long, detailed, unrelated answers, and that "every answer had killer, trained killer, Uncle Sam, or the federal government in it." (Tr. 118-19). It was also noted that Plaintiff "had a hard time remembering enough" about his past work. (Tr. 118).

In a Disability Report – Adult Form SSA-3368, Plaintiff indicated that he stopped working on January 15, 1987 because "employer lost the federal contract." (Tr. 120). Later in the same form, however, he stated that he stopped working at the post office in 1985 because he "snapped on the supervisor and was getting ready to cut his throat" after confronting him about "destroying thousands of federal checks." (Tr. 125). The section of the form describing Plaintiff's past work is blank. (Tr. 120-21).

In a Function Report Adult – Third Party dated October 18, 2007, Plaintiff's wife stated that they spend every day together but do not do much because he is medicated. (Tr. 128). She indicated that he sleeps most of the day and that his medication makes him sluggish. (Tr. 128, 131). She stated that he is paranoid, has dreams about the war he was in, and has hit her in his sleep several times, which has led them to sleep in separate rooms. (Tr. 134).

### III.  DECISION OF THE ALJ

The ALJ found that Plaintiff last met the insured status requirements of the Act on December 31, 1987, and that Plaintiff may have engaged in substantial gainful activity during the period from his alleged onset date of June 1, 1985 through his date last insured of December 31, 1987. (Tr. 13). The ALJ found that through the date last insured, Plaintiff had the following severe combination of impairments: a post traumatic stress disorder and a personality disorder. However, he found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14). He found that through the date last insured, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but that he was limited to simple work not requiring a lot of contact with others. (Tr. 15).

The ALJ then found that through the date last insured, Plaintiff was able to perform his past relevant work as a post office worker. (Tr. 19). In the alternative, the ALJ found, based on the Medical-Vocational Rules, that considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (Tr. 20). Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Act, at any time from his alleged onset date through his date last insured. (Tr. 21).

## IV. <u>GENERAL LEGAL PRINCIPLES</u>

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the

claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.   DISCUSSION

In appealing the Commissioner's decision, Plaintiff argues (1) that the ALJ's finding that Plaintiff could return to his past work as a post office worker is not supported by substantial evidence; (2) that the ALJ's alternative finding that Plaintiff could perform other jobs existing in significant numbers in the national economy was not supported by substantial evidence; and (3) that the ALJ erred by not considering medical evidence predating May 31, 1985, the disability onset date alleged by Plaintiff.

### A.   THE ALJ'S FINDING THAT PLAINTIFF COULD PERFORM HIS PAST RELEVANT WORK

Plaintiff argues that the ALJ's finding that Plaintiff could return to his past work as a post office worker was not supported by substantial evidence. The undersigned agrees.

The Eighth Circuit has repeatedly held that Social Security Ruling 82-62 requires an ALJ to "'fully investigate and make *explicit* findings as to the physical and mental demands of a

claimant's past relevant work and to compare that with what the claimant herself is capable of doing before [the ALJ] determines that [the claimant] is able to perform her past relevant work.'" *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting *Nimick v. Sec. of Health and Human Servs.*, 887 F.2d 864, 866 (8th Cir. 1989)); *see also Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999); *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir. 1991); SSR 86-62 (stating that "[i]n finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain . . . [a] finding of fact as to the physical and mental demands of the past job/occupation.").

The court in *Groeper* explained:

> An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity. The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. *See Kirby v. Sullivan*, 923 F.2d 1323, 1326–27 (8th Cir. 1991). A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work. *Id.* at 1327.

*Groeper*, 932 F.2d at 1238–39.

In *Groeper*, the ALJ found that the claimant "was able to perform simple repetitive tasks that have only minimal memory requirements," and that with that RFC, the claimant was capable of performing his past work as a bus boy or baker's helper. *Id.* at 1239. However, the ALJ did not set forth the physical or mental demands of the claimant's past work as a bus boy or baker's helper, and the record contained no evidence regarding the mental demands of those jobs. *Id.* at 1239. The court concluded that "[t]he ALJ failed to fully investigate and make findings regarding . . . the demands of [the claimant's] past work" and that he therefore "did not properly

evaluate [the claimant's] ability to perform past work." *Id.* The court remanded the case to the Commissioner. *Id. See also Pfitzner*, 169 F.3d at 569 (finding that substantial evidence did not support the ALJ's decision where the ALJ failed to make any specific findings about the demands of Plaintiff's past work before finding that Plaintiff could perform it).

Here, as in *Groeper*, the ALJ found that Plaintiff had certain mental limitations, limiting him to "simple work" that did not require a lot of contact with others. (Tr. 15). In addition, as in *Groeper*, the ALJ made a finding that Plaintiff "was able to perform his past relevant work." (Tr. 19). However, aside from noting that Plaintiff had been a "post office worker," the ALJ did not describe any of the mental demands of Plaintiff's past work. (Tr. 19-20). Moreover, the undersigned finds no evidence in the record regarding the mental demands of Plaintiff's past work at the post office; that work may or may not be "simple" and may or may not require "a lot of contact with others."

The undersigned rejects the Commissioner's suggestion that the ALJ "did not find that Plaintiff could perform his past relevant work," but rather found only that Plaintiff did not meet his burden of proving that he could not perform his past relevant work. *See* Def's Br. at 10. First, the ALJ *did* make an explicit finding that Plaintiff was able to perform his past relevant work. (Tr. 19). More importantly, as discussed above, the ALJ has a duty to investigate and make findings regarding Plaintiff's past work. *Groeper*, 932 F.2d at 1239. The ALJ also "bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). Here, the ALJ did not do even the most minimal development of the record regarding the demands of Plaintiff's past work. He did not ask Plaintiff any questions about the nature of his past work at the hearing, did not consult a

vocational expert regarding Plaintiff's past work, and did not point to a job in the Dictionary of Occupational Titles that corresponded to Plaintiff's past work.

The undersigned further rejects the Commissioner's argument that it would have been "pointless" for the ALJ to ask Plaintiff questions about his past work. *See* Def's Br. at 10. In support of this argument, the Commissioner points to a 2007 record of a telephone interview conducted by a disability examiner stating that "clmt had a very hard time remembering enough info [regarding his past work] to give me for an 821." (Def's. Br. at 10; Tr. at 116-18). However, the fact that Plaintiff did not remember some information regarding his past work on one occasion several years ago does not demonstrate that he would have been unable to answer some questions about it at the hearing before the ALJ.[2]

In sum, the ALJ has failed to make specific findings of fact regarding the mental and physical demands of Plaintiff's past work, as required by SSR 82-62 and Eighth Circuit precedent. Thus, the ALJ's finding that Plaintiff can perform his past relevant work is not supported by substantial evidence, and the undersigned recommends that the case be remanded.

**B. THE ALJ'S ALTERNATIVE FINDING THAT THERE WERE JOBS THAT EXISTED IN SIGNIFICANT NUMBERS IN THE NATIONAL ECONOMY THAT PLAINTIFF COULD HAVE PERFORMED**

Plaintiff also argues that the ALJ's alternative finding at Step Five that Plaintiff could perform jobs existing in significant numbers in the national economy was not supported by substantial evidence. (Pl's Br. at 17-18). The Commissioner does not respond to this argument.

The ALJ found that, through the date of last insured, given Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national

---

[2] The undersigned further notes that during the 2007 telephone interview, Plaintiff was "screaming at" the interviewer for lying and was also giving "long, detailed, unrelated answers." (Tr. 117-18). At the hearing before the ALJ, by contrast, Plaintiff appeared to be answering the questions presented.

economy that Plaintiff could perform.  (Tr. 20).  In making this finding, he relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and not on the testimony of a vocational expert.  (Tr. 20).

The Eighth Circuit has repeatedly held that where the ALJ determines that Plaintiff has a severe mental impairment, the ALJ may not rely on the Medical-Vocational Guidelines at Step Five.  *See Wheeler v. Sullivan*, 888 F.2d 1233, 1238 (8th Cir. 1989) (holding that it was improper for the ALJ to use the Medical-Vocational Guidelines at Step Five in a case involving a mental impairment and stating, "Since [the claimant] suffers from a severe mental impairment, the Secretary must use vocational expert testimony or other similar evidence in order to meet his burden of showing the existence of jobs in the national economy that the claimant is capable of performing"); *King v. Astrue*, 564 F.3d 978, 979 (8th Cir. 2009) (reversing and remanding based on *Wheeler* in a case involving a mental impairment; stating, "we can find no case in our circuit sanctioning the Commissioner's use of the grids at step five, as opposed to VE testimony, in a case involving a severe mental nonexertional impairment"); *Brock v. Astrue*, 674 F.3d 1062, 1065-66 (8th Cir. 2012) (reversing and remanding based on *King* and *Wheeler*; stating, "Because the ALJ determined that [the claimant] suffered from severe mental impairments, the ALJ should have consulted a vocational expert in determining whether [the claimant] had the RFC to perform other jobs that exist in significant number in the national economy.").

Here, the ALJ found that Plaintiff had a severe combination of mental impairments: posttraumatic stress disorder and a personality disorder.  (Tr. 14).  Thus, it was inappropriate for the ALJ to rely on the Medical-Vocational Guidelines at Step Five, and his alternative finding is not supported by substantial evidence.

## C. THE ALJ'S CONSIDERATION OF MEDICAL EVIDENCE PRECEDING PLAINTIFF'S ALLEGED DISABILITY ONSET DATE

Plaintiff also argues that the ALJ erred by not discussing any of the evidence prior to May 31, 1985, the day before Plaintiff's alleged onset date.

To establish that he is entitled to disability benefits under Title II, Plaintiff must establish that he became disabled prior to the expiration of his insured status on December 31, 1987. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Plaintiff alleged that his disability began on June 1, 1985. Thus, the most relevant period for the ALJ to consider was that between June 1, 1985, and December 31, 1987. However, as other courts have noted, "[e]vidence before the onset date can be relevant because, 'the ALJ should consider medical evidence in light of the medical presumptions that reasonably can be made about the course of the condition.'" *Dew v. Commissioner of Social Security*, Civ. No. 09-1986 (JMR/JJK), 2010 WL 3033779, at *3 n.2 (D. Minn. July 9, 2010), *Report and Recommendation adopted*, 2010 WL 3033772 (D. Minn. July 26, 2010) (quoting *Davis v. Astrue*, No. C06-4106-PAZ, 2008 WL 130778, at *3 (N.D. Iowa Jan. 15, 2008)).

In this case, the bulk of the medical records relevant to Plaintiff's alleged impairments date from the three years immediately preceding Plaintiff's alleged onset date. Those records contain, among other things, details regarding the aircraft carrier accident that was the alleged cause of Plaintiff's problems (Tr. 257); evidence of Plaintiff's paranoid thoughts and statements regarding government officials, the CIA, "whites," and the VA hospital (Tr. 258, 285-86, 301-02); evidence of Plaintiff's persistent nightmares (Tr. 257, 301, 344); evidence of Plaintiff's hostile and erratic behavior, including threatening behavior (Tr. 281-286); evidence of Plaintiff's grandiose thoughts regarding his responsibility for "keeping the people alive" (Tr. 312); evidence of Plaintiffs speech problems (Tr. 292, 301, 344-45); evidence of Plaintiff's suicidal

thoughts (Tr. 312); evidence of Plaintiff's multiple hospitalizations for mental impairments (Tr. 265, 315-34); evidence that the VA found Plaintiff partially disabled as of 1981 (Tr. 153); mentions by a third party of "bizarre" behavior (Tr. 315); information regarding Plaintiff's employment history (Tr. 257, 306, 307, 310, 312); and diagnoses or mentions of post-traumatic stress disorder, major depression, severe anxiety, psychosis, drug psychosis, adjustment disorder, obsessive-compulsive personality, and schizophrenia (Tr. 258, 260, 292-93, 302, 309, 310, 312, 332).

The undersigned finds that the above evidence is important evidence that provides insight into Plaintiff's impairments, particularly given that it is close in time to Plaintiff's alleged onset date. The ALJ's decision does not discuss any of these records. The only reference to them is the single statement that "medical records from before and after the period in issue show that he has had problems getting along with others." (Tr. 14). The undersigned does not find that this single statement indicates that the ALJ adequately evaluated this evidence. On remand, the ALJ should consider this evidence and determine whether it affects his determinations with regard to Plaintiff's impairments and abilities. *See Burgett v. Astrue*, No. 2010 WL 2696259, at *19-*20 (D. Minn. June 27, 2010) (reversing and remanding where the ALJ failed to consider "important evidence that provides insight into the claimant's impairments," even where much of that evidence predated Plaintiff's alleged onset date) (internal quotation marks omitted), *Report and Recommendation adopted*, 2010 WL 2696276 (D. Minn. July 6, 2010).

Because it is unclear from the ALJ's decision whether he considered the above evidence predating Plaintiff's disability date, the undersigned recommends that, on remand, the ALJ consider that evidence in determining whether Plaintiff is disabled and make that consideration clear in his decision.

## VI.     CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence.

Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of February, 2013.